UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

STEPHANIE N. WOODS,                  )
                                     )
          Plaintiff,                 )
                                     )
     vs.                             )          Case No. 4:09CV1925 CDP
                                     )
MICHAEL J. ASTRUE,                   )
Commissioner of Social Security,     )
                                     )
          Defendant.                 )

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the

Commissioner's final decision denying Stephanie Woods' application for

supplemental security income benefits under Title XVI of the Social Security Act,

42 U.S.C. §§ 1381 *et seq.* Woods claims she is disabled because she suffers from

manic depression and paranoid schizophrenia. The Administrative Law Judge

concluded, however, that Woods is not disabled, and Woods now appeals that

decision. Because the ALJ's assessment of Woods' residual functional capacity is

not supported by substantial evidence, I will reverse the ALJ's decision and

remand to the Commissioner for further consideration.

## Procedural History

On November 28, 2006, Stephanie Woods filed for supplemental security

income payments. The Social Security Administration denied Woods' application

at the initial level, and Woods filed a timely request for a hearing on her claim.

Woods appeared and testified at a video hearing held on February 18, 2009. The

ALJ issued an opinion on May 5, 2009 upholding the denial of benefits. On

October 14, 2009, the Appeals Council of the Social Security Administration

denied Woods' request for review. Accordingly, the ALJ's determination stands

as the Commissioner's final determination. Woods filed this request for review on

November 23, 2009.

## Testimony Before the ALJ

At the time of the administrative hearing, Woods was twenty-nine years old

and lived alone with her young daughter. She was a high school graduate and had

also completed a one-year business technology degree at a vocational school.

Woods testified that she was currently receiving treatment for manic

depression and bipolar disorder. She had previously been diagnosed with paranoid

schizophrenia, but her diagnosis had changed around 2006. She stated that her

symptoms included suffering from a large amount of depression and having

difficulty with concentrating, communicating, and dealing with stress. Woods also

said that she had problems with remembering sequential steps in order, and that

she sometimes had anxiety attacks during which she would have pains in her chest

and abdomen and difficulty breathing. She testified about having trouble

maintaining friendships, because people saw her "as a moody person" or someone

who has "a lot of mood swings." When her life was stressful, Woods would have crying spells and headaches, requiring her to lie down until she relaxed. Woods testified that these symptoms had been aggravated in the past when she worked.

Woods also testified that she had not been able to maintain herself without medicine and the care of a psychologist. From 2003 to the end of 2006, Woods was treated by Dr. Thomas once every three months. Dr. Thomas also prescribed medication for her. After Dr. Thomas left her clinic, Woods began treatment first with Dr. Gladieux, and then with Dr. Fontaine.

Woods stated that she did not work at the time of the hearing, and had not worked since 2002, when she was a full-time sales clerk associate at Mobil Gas for nine months. At that job, she was responsible for maintaining the store, including the cash register. However, she quit the position after being informed that she could either quit or be terminated, because she was unable to run the register correctly. Woods testified that she had trouble with correctly counting change because she could not remember the steps and was distracted.

When asked about her daily life activities, Woods said that she was able to bathe and dress herself without assistance, and could prepare meals and clean up after herself. She also testified that she occassionally shops for herself and can pick out items and pay for them. She also stated that she took care of her young daughter, who actually helped Woods out with her symptoms.

The ALJ called a vocational expert, Jeanine Metildi, who had been provided with and reviewed Woods' file, including her past work history. Metildi testifed that Woods had previously worked as a cashier and a sewing machine operator in a factory. The ALJ described a hypothetical individual for Metildi who was twenty-nine years old with a high school diploma and a business technology degree; and who had no exertional limitations but did have psychological limitations, including working in a low-stress environment that would permit (a) only occasional decision making, changes in work setting, and exercises in judgment; (b) no production rate and pace work, meaning no other employee would be dependent on the individual completing her assignment; and (c) only occasional interaction with the public and co-workers without any confrontations, arbitration, or negotiation. The ALJ then asked Metildi whether this hypothetical person could perform Woods' past work, to which Metildi responded, "[t]he only job that could be performed would be the sewing that she was performing . . . ."

Woods' attorney at the hearing also asked Metildi whether the same hypothetical individual could perform her past work if she was unable to maintain concentration to detailed work for more than two hours at a time. Metildi responded that such an individiual could do neither Woods' past work nor any other work. Finally, the ALJ posed another question: whether that hypothetical individual could perform Woods' past work if she were limited to simple, routine,

and repetitive tasks.  Metildi responded that such an individual could perform Woods' past work as a sewing machine operator.

## **Medical Records**

The medical records reveal that Woods has been receiving treatment for her mental disorders, including paranoid schizophrenia, manic depression, and bipolar disorder, since 2000.  After Woods completed treatment in early 2000 for illicit drug use, including the use of marijuana and crack cocaine, she began to suffer from hallucinations and paranoia.  This caused her to seek treatment with Donna Bond, MSN, APRN, approximately every two months.  Woods also attempted vocational rehabilitation, and her case was closed after she found work in her parents' western supply store.  However, her mother later reported to the vocational rehabilitation that Woods was not being paid for her work, because Woods was unable to multi-task as required.

In April of 2002, Woods began treatment at Ozark Medical Behavioral Health Care with Jeff Farrow, Psy. D.  She was diagnosed with schizoaffective disorder and assessed a Global Assessment of Functioning (GAF) of 40-50.[1]  Also around that time, Woods began treatment with Thomas Thomas, M.D.  Dr.

---

[1]"The GAF is a numeric scale ranging from zero to one hundred used to rate social, occupational and psychological functioning 'on a hypothetical continuum of mental health-illness.'" *Pate-Fires v. Astrue*, 564 F.3d 935, 937 n.1 (8th Cir. 2009) (quoting the Diagnostic and Statistical Manual of Mental Disorders, 32 (4th ed. Am. Psychiatric Ass'n 1994) (DSM-IV)).  GAF scores of 41-50 indicate that the individual has "[s]erious symptoms . . . or any serious impairment in social, occupational, or school functioning . . . ." DSM-IV at 32.

Thomas's treatment notes from May of 2002 indicate that, although Woods was somewhat blunt in affect, she was calm, oriented, and not psychotic.  Dr. Thomas also noted that Woods should continue with her treatment regime of Resperdal and Effexor for her schizophrenia, paranoid type.  Woods continued with this medication and visited Dr. Thomas about every three months throughout 2002. Although the medications helped her with her symptoms, including her confusion and crying, Woods still reported problems with her disorders during her visits with Dr. Thomas.  Accordingly, in October of 2002, Dr. Thomas replaced her Risperdal prescription with Geodon.

After discovering that she was pregnant in January of 2003, Woods returned to Dr. Thomas for a medication change.  Dr. Thomas agreed and changed her prescription to Prozac and Geodon.  She used these medications throughout her pregnancy and remained stable, although she reported sleeping a lot in December of 2003 after her daughter was born.  She also was stressed about being late and concerned with driving in the snow, so Dr. Thomas changed her prescription once again to Geodon and Wellbutrin.

Throughout 2003 and 2004, Woods continued taking her medication and visited Dr. Thomas about every three months.  Although she was mostly stable during this time, she also occasionally reported stress to Dr. Thomas, which aggravated her symptoms.  For example, in March of 2004, Woods reported that

she was "getting increasingly stressed." Dr. Thomas indicated then, and again in

September of 2004, that he did not believe Woods could function well with work.

Woods continued to visit with Dr. Thomas and take her medications in 2005 and

2006.

When Dr. Thomas left Behavioral Health Care in late 2006, Woods began

treatment with Kenneth Gladieux, MD. His first treatment notes from December

of 2006 indicate that Woods was alert and calm and that her affect was full. He

assessed her as stable, and decided that she should continue taking Wellbutrin and

Geodon and should return in three months for an evaluation. At her next visit with

Dr. Gladieux in March of 2007, Woods reported that she was having some

sleeping disturbance. Dr. Gladieux noted that she was stable, but that she should

start taking her medications at night instead of in the morning so that she would

sleep during the night. Dr. Gladieux also completed a Medical Source Statement –

Mental at that time, indicating that Woods was markedly limited in her abilities to

understand, remember, and carry out detailed instructions, and moderately limited

in her abilities to do many other things, including the ability to perform activities

within a schedule and work in coordination to others without being distracted by

them. In July of 2007, Woods reported "persistent depressed mood, inverted

sleeping pattern, and some spontaneous crying spells," but she denied psychotic

symptoms or overt mania. In his treatment notes from that day, Dr. Gladieux

noted that Woods was alert and calm, but appeared somewhat somber with a neutral mood and a mildly restricted affect. He decided to increase her Wellbutrin dosage and have her return to the clinic for psychiatric evaluation in two weeks.

When Woods returned later that July, she met with David Fontaine, DO, who noted that, although Woods was doing "relatively well" when she took Wellbutrin and Geodon, she needed some encouragement "to get into the activities of daily living" and had difficulty getting any enthusiasm. He diagnosed her with bipolar disorder in medical remission and assessed her mood as fair, but determined that she was too fragile to work within the public or handle any great changes in her life.

Woods saw Dr. Fontaine again in October of 2007. He noted that she was able to take care of things at home but was still "markedly limited in her ability to do things for the public or to work," even with her medications. He assessed her GAF as 45. On that same, Dr. Fontaine completed a Medical Source Statement-Mental, opining that Woods was moderately limited in all areas of mental functioning.

Dr. Fontaine treated Woods throughout 2008 and in January of 2009, one month before her hearing. His records from this time reveal that Woods was mostly stable with her medications but occasionally suffered symptoms from her bipolar disorder even with her medications. Dr. Fontaine opined in May of 2008

that Woods would not be able to handle working because she could not deal with the stress. In October of 2008, he completed a second Medical Source Statement – Mental, in which he concluded once more that Woods was moderately limited in all areas of mental functioning.

## Legal Standard

A court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001). Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the ALJ's conclusion. *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000). As long as there is substantial evidence on the record as a whole to support the Commissioner's decision, a court may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, *id.*, or because the court would have decided the case differently. *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992). In determining whether existing evidence is substantial, a court considers "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 200) (citation omitted).

To determine whether the decision is supported by substantial evidence, the Court is required to review the administrative record as a whole to consider:

(1)     the credibility findings made by the Administrative Law Judge;

(2)     the education, background, work history, and age of the claimant;

(3)     the medical evidence from treating and consulting physicians;

(4)     the plaintiff's subjective complaints relating to exertional and non-exertional impairments;

(5)     any corroboration by third parties of the plaintiff's impairments; and

(6)     the testimony of vocational experts when required which is based upon a proper hypothetical question.

*Brand v. Secretary of Dep't of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980).

Disability is defined in the social security regulations as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 416(i)(l); 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a) and 416.905(a). In determining whether a claimant is disabled, the Commissioner must evaluate the claim using a five-step procedure.

First, the Commissioner must decide if the claimant is engaging in substantial gainful activity. If the claimant is engaging in substantial gainful activity, he is not disabled.

Next, the Commissioner determines if the claimant has a severe impairment which significantly limits the claimant's physical or mental ability to do basic work activities. If the claimant's impairment is not severe, he is not disabled.

If the claimant has a severe impairment, the Commissioner evaluates whether the impairment meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

If the Commissioner cannot make a decision based on the claimant's current work activity or medical facts alone, and the claimant has a severe impairment, the Commissioner reviews whether the claimant can perform his past relevant work. If the claimant can perform his past relevant work, he is not disabled.

If the claimant cannot perform his past relevant work, the Commissioner must evaluate whether the claimant can perform other work in the national economy. If not, the Commissioner declares the claimant disabled. 20 C.F.R. §§ 404.1520 and 416.920.

When evaluating evidence of subjective complaints, the ALJ is never free to ignore the subjective testimony of the claimant, even if it is uncorroborated by objective medical evidence. *Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir. 1984). The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. *See, e.g., Battles v.*

*Sullivan*, 992 F.2d 657, 660 (8th Cir. 1990).  In considering the subjective complaints, the ALJ is required to consider the factors set out by *Polaski v. Hecler*, 739 F.2d 1320 (8th Cir. 1984), which include:

> claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1.   the claimant's daily activities;
>
> 2.   the duration, frequency, and intensity of the pain;
>
> 3.   precipitating and aggravating factors;
>
> 4.   dosage, effectiveness and side effects of medication;
>
> 5.   functional restrictions.

*Id.* at 1322.

## The ALJ's Findings

The ALJ found that Woods does not suffer from a disability within the meaning of the Social Security Act at any time through the date of the decision. He issued the following specific findings:

> 1.   Woods has not engaged in substantial gainful activity since November 28, 2006, the amended alleged onset date.  20 C.F.R. §§ 416.971 *et seq.*
>
> 2.   Woods has the following severe impairment: bipolar disorder. 20 C.F.R. § 416.920.
>
> 3.   Woods does not have an impairment or combination of impairments that meets or medically equals one of the listed

impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. §§ 416.925 and 416.926.

4.      Woods has the residual functional capacity to perform a full range of work at all exertional levels but is limited to simple routine repetitive tasks with limitation to low-stress tasks that permit occasional changes in the work setting and occasional exercise of judgment, no production rate and pace work, occasional interaction with the public and coworkers, and limit to superficial, non-confrontational and non-arbitration/negotiation types of interaction.

5.      Woods is capable of performing past relevant work as a factory laborer. This work does not require the performance of work-related activities precluded by Woods' residual functional capacity. 20 C.F.R. § 416.965.

6.      Woods has not been under a disability as defined in the Social Security Act since November 28, 2006, the date the application was filed. 20 C.F.R. § 416.920(f).

The ALJ concluded, based the treatment records before him, that Woods has mild to moderate difficulties in her daily-life activities, including functioning within society; being able to understand, remember, and carry out detailed instructions; and maintaining concentration, persistence, and pace. In making these determinations, the ALJ gave "greater weight" to the longitudinal treatment records before him, and "some weight" to the opinion of Dr. Gladieux that Woods was markedly limited in her ability to understand, remember, and carry out detailed instructions. However, the ALJ did not give any weight to Dr. Fontaine's medical source statements, disability opinions, or GAF scores. The ALJ concluded Dr. Fontaine's opinions were not supported by objective findings or

clinical evidence, and were inconsistent with the other evidence in the record, including evidence that Woods had "consistently reported doing well on medications since the amended alleged on set date, with no psychotic symptoms or significant disturbance in her mood." The ALJ did not mention Dr. Thomas's records or opinions.

Additionally, the ALJ determined that Woods' subjective complaints about the intensity, persistence, and limiting effects of these symptoms was belied by her ability to care for her young daughter and things at home. He noted that she was thinking about attending real estate school, was engaged to be married, and had recently and successfully dealt with a stressful move. Based on these limitations and abilities, the ALJ concluded that she could return to her past relevant work as a factory laborer who sewed fabric into uniforms and, thus, was not disabled.

## **Discussion**

When reviewing a denial of Social Security benefits, a court cannot reverse an ALJ's decision simply because the court may have reached a different outcome, or because substantial evidence might support a different outcome. *Jones ex rel. Morris v. Barnhard*, 315 F.3d 974, 977 (8th Cir. 2003); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993). Instead, the court's task is a narrow one: to determine whether there is substantial evidence on the record as a whole to support the ALJ's decision. 42 U.S.C. § 405(g); *Estes v. Barnhard*, 275 F.3d 722, 724 (8th Cir.

2002).  On appeal, Woods raises three issues.  First, she claims the ALJ did not properly consider Dr. Fontaine's opinions before dismissing them.  Second, Woods argues the ALJ's residual functional capacity determination is not supported by substantial evidence, because the ALJ failed to consider all her treating physicians' opinions and, instead, substituted his own medical judgment. Finally, Woods asserts the ALJ erred by relying on faulty vocational expert testimony to determine whether she could return to her past work as a factory worker.  Because I conclude that the ALJ did not properly consider the opinions of Woods' treating physicians when determining her residual functional capacity, I will only consider that issue in this memorandum.

Residual functional capacity is what the claimant can still do despite her physical or mental limitations.  20 C.F.R. pt. 404.1545(a); *Lauer v. Apfel*, 245 F.3d 700, 703 (8th Cir. 2001).  The ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence." *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000).  Although the ALJ is not limited to considering only medical evidence in making this assessment, the ALJ is "required to consider at least some supporting evidence from a professional," because a claimant's residual functional capacity is a medical question.  *Lauer*, 245 F.3d at 704.

When considering professionals' opinions, the ALJ must defer to a treating physician's opinions about the nature and severity of a claimant's impairments, "including symptoms, diagnosis, and prognosis, what an applicant is capable of doing despite the impairment, and the resulting restrictions." *Ellis v. Barnhard*, 392 F.3d 988, 995 (8th Cir. 2005) (citing 20 C.F.R. pt. 404(a)(2)). A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record. *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998). While a treating physician's opinion is usually entitled to great weight, the Eighth Circuit has cautioned that it "does not automatically control, since the record must be evaluated as a whole." *Bentley v. Shalala*, 52 F.3d 784, 785-86 (8th Cir. 1995). After reviewing the record as a whole, an ALJ may discount or disregard a treating physician's opinion if other medical assessments are supported by better or more thorough medical evidence, or where a treating physician gives inconsistent opinions that undermine the credibility of the opinions. *E.g., Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000).

Here, the ALJ concluded that Woods had the residual functional capacity for work at all exertional levels, but was

> limited to simple routine repetitive tasks with limitation to low stress
> tasks which permit occasional decision-making, occasional changes in

the work setting and occasional exercise of judgment, no production rate and pace work, occasional interaction with the public and coworkers, and limit to superficial, non-confrontational and non-arbitration/negotiation types of interaction.

In making this determination, the ALJ noted that he gave "some weight" to Dr. Gladieux's opinion that Woods was "markedly limited [in] her ability to understand, remember and carry out detailed instructions," which was "consistent with [Woods'] bipolar disorder and would limit her to simple repetitive tasks." Additionally, he indicated that he gave no weight to Dr. Fontaine's medical source statements, disability opinions, or GAF scores, because they were inconsistent with Dr. Fontaine's treatment records. After reviewing the entire record, I conclude that ALJ's residual functional capacity determination is not supported by substantial evidence, because the ALJ failed to properly consider the opinions of Drs. Gladeux and Fontaine. In particular, the ALJ failed to provide a good reason for only giving "some" weight to Dr. Gladieux's opinion, and also improperly rejected Dr. Fontaine's opinions, which were consistent with his treating records and the substantial weight of the evidence.

On March 28, 2007, Dr. Gladieux completed a Medical Source Statement – Mental in which he opined, albeit in conclusory fashion, that Woods was markedly limited in her ability to understand, remember, and carry out detailed instructions. Dr. Gladieux also indicated that Woods was moderately limited in several areas, including in her abilities:

- to remember locations and work-like procedures;

- to maintain attention and concentration for extended periods;

- to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;

- to sustain an ordinary routines without special supervision;

- to work in coordination or proximity to others without being distracted by them; to complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;

- to accept instructions and respond appropriately to criticism from her supervisors;

- to respond appropriately to changes in the work setting;

- to travel in unfamiliar places or use public transportation;

- to set realistic goals or make plans independently of others.

Taken together, these statements, if believed, would support the conclusion that Woods is disabled. *See Pate-Fires v. Astrue*, 564 F.3d 935, 944-45 (8th Cir. 2009) (record revealed that plaintiff was not capable of participating in gainful employment when, among other limitations, plaintiff was impaired in her ability to tolerate stress, stay focused on minor tasks, interact with supervisors, and follow instructions). Although an ALJ may disregard conclusory opinions as these, *see Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010), the ALJ in this case did not state that he was disregarding them for that reason, or, indeed, for any reason. Indeed, the ALJ incorporated part of the opinions – Dr. Gladieux' conclusion that

Woods was markedly limited in her ability to remember and carry out detailed instructions – into his RFC determination. The ALJ's failure to explain why he considered some but not all of Dr. Gladieux's opinions renders the decision unclear. *See McCadney v. Astrue*, 519 F.3d 764, 767 (8th Cir. 2008) (while an ALJ may discount a treating physician's opinion "if the record warrants" it, the ALJ must explain why he did so).

This error is compounded by the fact that the remaining substantial evidence in the record supports the conclusion that Woods is severely limited in her ability to work. Dr. Gladieux's treatment notes indicate that Woods is stable when she takes her medications, but that, even then, Woods still struggles with her daily life activities. For instance, in December of 2006, Dr. Gladieux noted that Woods appeared alert and calm, with a full affect and euthymic mood.[2] However, on March 28, 2007, he indicated that her sleeping patterns were inverted, and on July 2, 2007, he noted that Woods was experiencing "some persistent depressed mood, inverted sleeping, and some spontaneous crying spells." Rather than indicating that Woods is able to maintain a daily work schedule doing simple and repetitive tasks, these records support Dr. Gladieux's conclusion that Woods is moderately limited in her ability to work without interruption from her psychological

---

[2]A euthymic mood is "a normal mood in which the range of emotions is neither depressed nor highly elevated." The Free Dictionary by Farley, http://medical-dictionary.thefreedictionary.com/euthymic.

symptoms, including depression and crying spells. Indeed, the records suggest Woods is limited in her ability to function without interruption from her bipolar disorder even when she takes her medications and does not work.

This conclusion is also supported by Dr. Fontaine's records, which suggest Woods is unable to maintain a daily work schedule because of her bipolar disorder. Specifically, Dr. Fontaine indicates several times throughout his treatment records that, although Woods is stable while taking her medications, she is too fragile to handle the stress of a work schedule. The ALJ disregarded this opinion, along with Dr. Fontaine's medical source statements and GAF scores, concluding that they were inconsistent with the other evidence. In particular, the ALJ noted that Woods has consistently reported doing well on her medications since the alleged onset date, with no psychotic symptoms or significant disturbance in her mood. While Dr. Fontaine's notes do indicate that Woods is stable for the most part when she is medicated, that is not inconsistent with his conclusion that adding a daily work schedule to her life would cause her to become unstable. *See Pates-Fire*, 564 F.3d at 943 (treating physician's opinion that claimant was disabled was not inconsistent with the fact that her "schizoaffective disorder was in remission," because physician's notes "do not indicate that [physician] believed she was sufficiently stable to return to work, even if she was compliant with recommended treatment and medication."); *see*

*also Hutsell v. Massanari*, 259 F.3d 707, 712 (8th Cir. 2001) ("We also believe the Commissioner erroneously relied too heavily on indications in the medical record that Hutsel was 'doing well,' because doing well for the purposes of a treatment program has no necessary relation to a claimant's ability to work or to her work-related functional capacity."). As Dr. Fontaine indicated in his letter on May 2, 2008, although Woods' medications help her and, on the surface, she appears to do quite well, her bipolar disorder prevents her from handling large amounts of stress, and she has difficulty with the activities of daily living even when she does not work. Additionally, the record does not support the ALJ's conclusion that Woods has had no significant disturbances in her mood since regularly taking her medications. As outlined above, Woods reported persistent depressed mood, crying spells, and sleeping disorders to Dr. Gladieux after months of stability and without any reported stressful incidents.

These determinations are also consistent with the opinions of Dr. Thomas. Although Dr. Thomas treated Woods before her alleged onset date of November 28, 2006, Dr. Thomas's treatment records and opinions were part of the evidence before the ALJ. *Cf. Prosch*, 201 F.3d at 1013 (because, "[i]n evaluating the reliability of a treating physician's opinion, both the regulations and our case law require the ALJ to consider the opinion in light of the record as a whole," ALJ did not err by considering a treating physician's first opinion from before the

claimant's alleged onset date to determine whether it was consistent with the physician's later opinion).  Like Dr. Fontaine, Dr. Thomas concluded in 2004 that Woods could not cope with the stress of a regular job because of her bipolar disorder, even if she was stable with her medications.

The ALJ also discounted Dr. Fontaine's conclusions as inconsistent with the medical records, because Woods indicated that she was able to take care of her daughter and her home, had given some thought to attending real estate school, was engaged to be married, and had recently coped with the stress of a move.  But these statements do not overcome Dr. Fontaine's medical opinion and the rest of the record.  Although these activities show that Woods is stable and improving in her ability to function in her daily life, they are not inconsistent with Dr. Fontaine's conclusion that Woods would have greater difficulties with maintaining a work schedule because of her bipolar disorder.  The ALJ was correct that Dr. Fontaine's records indicate that Woods coped well with the one-time stress of moving, but it must also be noted that dealing with the stress of a one-time event is different from dealing with the continuous stress of a daily and weekly work schedule.  Accordingly, Woods' ability to cope with the stress of moving is not inconsistent with Dr. Fontaine's conclusion about her inability to work at a regular schedule.

Because Dr. Fontaine's conclusions about Woods' inability to work are consistent with his own treatment records and the other substantial evidence, the ALJ erred by discounting them. The ALJ also erred by failing to explain why he only gave "some weight" to the opinions of Dr. Gladieux. Like Dr, Fontaine's opinions, Dr. Gladieux's opinions are consistent with the record as a whole, so the ALJ needed to provide some "good reason" for disregarding them. Because of these errors, the ALJ's RFC determination and his determination that Woods can return to her past work as a factory worker are not supported by substantial evidence. I will therefore reverse the decision and remand the case to the Commissioner for further proceedings consistent with this opinion.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is reversed, and this case is remanded under sentence four of 32 U.S.C. § 3405(g) for the reasons stated herein.

A separate judgment in accord with this Memorandum and Order is entered this same date.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 26th day of January, 2011.